Mildred S. SOUTHERN, Administratrix of the ESTATE OF William Charles SOUTHERN, Plaintiff,

v.

METROMONT MATERIALS, LLC, a South Carolina Corporation; RMC Industries Corporation, a Delaware Corporation; and RMC Group, PLC, a United Kingdom Corporation, Defendant.

No. 1:02 CV 238–C.

United States District Court,
W.D. North Carolina,
Asheville Division.

March 25, 2004.

Eugene W. Ellison, Asheville, NC, Frances P. Solari, Durham, NC, for Plaintiff.

Rodney Dean, Thomas G. Nance, II, Dean & Gibson, Charlotte, NC, for Defendants.

## MEMORANDUM OF DECISION

COGBURN, United States Magistrate Judge.

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment and Plaintiff's motions to refuse summary judgment, to impose sanctions,[1] to hold Defendants and their counsel in contempt of court, and to compel discovery. Having considered the pleadings, the parties' briefs, the arguments of counsel, and the applicable law, the Court will grant Defendants' motion for summary judgment and deny Plaintiff's motions as set forth below.

## PROCEDURAL BACKGROUND

This dispute arises out of a fatal workplace accident that occurred on November 1, 2000 at a concrete block manufacturing plant in Hendersonville, North Carolina, as a result of which Plant Manager William Southern died. Plaintiff Mildred Southern, the administratrix of Mr. Southern's estate, filed this action on October 17, 2002 against Defendant Metromont Materials, LLC ("Metromont"), Plaintiff's employer and owner of the Hendersonville plant; Defendant RMC Industries Corporation ("RMC"), of which Metromont is a wholly owned subsidiary; and Defendant RMC Group, PLC ("RMC Group"), of which RMC is a wholly owned subsidiary. In the Complaint, Plaintiff alleges that Defendants are liable for the wrongful death of William Southern under the North Carolina Wrongful Death Act, N.C. Gen.Stat. §§ 28A–18–1 through 28A–18–8.

Defendants subsequently filed a motion to dismiss, which was denied by this Court on April 11, 2003. On September 12, 2003, Defendants filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and the Court's pre-

---

1. Plaintiff has actually filed two separate mo-    tions to impose sanctions.

trial scheduling order. On that same date, Plaintiff filed a motion to compel and to extend time for discovery. Plaintiff subsequently filed a brief in response to Defendants' motion for summary judgment, as well as a motion to refuse summary judgment and a motion to impose sanctions.

On December 8, 2003, this Court entered an order granting in part and denying in part Plaintiff's motion to compel and granting in part and denying in part Plaintiff's motion to extend time for discovery. In its order, the Court required Defendants to produce all Occupational Safety and Health Administration ("OSHA") reports from the ten years prior to Mr. Southern's death relating to injuries or deaths at Defendants' places of business caused by powered industrial trucks ("PITs") as defined in 29 C.F.R. § 1910.178(a)(1) or to certify that no such reports, other than those already produced, exist. On January 15, 2004, Defendants filed a Notice of Compliance, to which they attached the affidavit of Mr. Paul Crosby, Metromont's Human Resources and Safety Director. In his affidavit, Mr. Crosby stated that he had requested copies of any OSHA 200 log sheets containing listings for any accidents involving personal injury or death from a PIT and a copy of any investigation report prepared by OSHA. (Crosby Aff. attached to Def. Notice of Compliance ("Crosby Aff.") at 2). Mr. Crosby stated that he also attempted to contact persons at the applicable plants and that he identified only one accident that fit the description in the Court's order, but he also included information related to a second accident to which Plaintiff had previously referred as similar. (*Id.*)

On January 30, 2004, Plaintiff filed a supplemental response to Defendants' motion for summary judgment and a second motion to compel discovery, to which Defendants filed a reply on February 13, 2004. In her second motion to compel, Plaintiff argued that Defendants still had not certified that they had produced the records required from each of the Defendants, but rather, had limited its document production to accidents that occurred at Metromont plants only. Defendants responded by filing the second affidavit from Mr. Crosby, in which Mr. Crosby stated that he contacted all of Defendants' plants in the United States, including plants owned by Defendant RMC. (Crosby Suppl. Aff. attached to Def. Resp. to Pl. Second Mot. to Compel ("Crosby Suppl. Aff.") at 1). Mr. Crosby stated that he did not contact Defendant RMC Group's plants outside of the United States, as they are not subject to OSHA regulations and requirements. (*Id.*) Mr. Crosby then listed the fourteen corporate owners that operate Defendants' plants and certified that the reports he had previously provided to Plaintiff constitute all reports meeting the criteria set forth in the Court's order on Plaintiff's first motion to compel. (*Id.* at 2). As both parties have had ample opportunity to brief the motions before the Court, the motions are now ripe for resolution.

## FACTUAL BACKGROUND

As stated above, this case concerns a fatal workplace accident at the Metromont plant in Hendersonville, North Carolina on November 1, 2000. At the time of the accident, the decedent, William Southern, was the plant manager of the Metromont Hendersonville plant, having been employed by Metromont since 1961. (Crosby Aff. attached to Def. Mot. for Summ. J. ("Crosby Summ. J. Aff.") at 2, 10). The Metromont Hendersonville plant is a small facility involved in the production of concrete blocks and employs five people. (Crosby Summ. J. Aff. at 2). With respect to the layout of the plant, the evidence before the Court establishes that the plant

consisted of a large warehouse-type building that was approximately seventy-two feet in length. (*Id.* at 4). On either end of the plant and with a straight passage between them, there were large garage door openings through which a forklift traveled approximately 120 times per day, transferring concrete block between an outside kiln at the front of the plant and a storage area outside the plant to the rear. (Crosby Summ. J. Aff. at 4; Putnam Aff. ¶ 4; Guy Aff. ¶ 2; North Carolina Department of Labor OSHA Accident Inspection Report attached as Exh. 7 to Crosby Summ. J. Aff. ("NCOSHA Report")).

As plant manager, Mr. Southern was responsible for safety issues relating to the plant and was responsible, according to Mr. Crosby, for ensuring that all plant employees were properly trained. (*Id.*) In his role as plant manager, Mr. Southern conducted four safety meetings a year and was responsible for the implementation of the procedures outlined in the Metromont Safety and Health Manual. (Crosby Summ. J. Aff. at 10; Exh. 3 attached to Crosby Summ. J. Aff.). Also as plant manager, Mr. Southern was able to observe on a daily basis the continual operations of the forklift, (Crosby Summ. J. Aff. at 9; Putnam Aff. ¶ 6), and the evidence suggests that he had been in the open plant area for some time on the day of the accident and had walked several times across the path of the forklift, as he worked to resolve a temperature problem with the kiln, (Putnam Aff. ¶ 5; Metromont Investigation Memo. attached as Exh. 1 to Crosby Summ. J. Aff. ("Metromont Investigation Memo.") at 1).

Reports from witnesses and subsequent investigation show that at approximately 2:00 p.m. on November 1, 2000, a forklift driven by Metromont employee Michael Putnam, entered through the door at the south end of the building and traveled approximately seventeen feet before striking Mr. Southern who walked into the forklift from the east side of the building. (Guy Aff. ¶ 4; Metromont Investigation Memo.; NCOSHA Report at 3). Mr. Southern fell down and struck his head on the concrete floor, and his left leg went underneath the right rear tire of the forklift. (Metromont Investigation Memo.). The area from which Mr. Southern was walking was open with no aisles or obstructions. (Crosby Summ. J. Aff. at 4; Putnam Aff. ¶ 3; Guy Aff. ¶ 2; Massey Aff.). Scott Guy, an eye witness to accident, stated that the forklift was being operated in a normal manner, at a normal speed, and in the standard path of travel through the plant at the time of the accident. (Guy Aff. ¶ 4). Mr. Putnam stated, also, in his affidavit that he was traveling in a straight line at the normal speed which he had utilized for previous trips on the day of the accident and normally used in his operation of the forklift at the plant. (Putnam Aff. ¶ 7). Mr. Putnam reported that he had glanced away, and other witnesses reported that Mr. Southern was also looking away from the direction the forklift was coming. (Guy Aff. ¶ 4; Massey Incident Report attached as Exh. D to Pl. Resp. Opp. Summ. J. ("Massey Incident Report") at 3; NCOSHA Report at 3). Mr. Southern's left leg was dragged by the right rear tire of the forklift, and there were skid marks approximately five feet long behind that tire. (NCOSHA Report at 3; Crosby Summ. J. Aff. at 9). Mr. Southern was airlifted to a hospital in Asheville, North Carolina but never regained consciousness and was pronounced dead at approximately 6:30 a.m. on November 2, 2000, following his removal from life support. (NCOSHA Report at 2).

Evidence collected after the accident suggests that Mr. Southern had little vision in his left eye due to an impairment and that on the day of the accident he had only reading glasses, having left his glass-

es at home. (Guy Aff. ¶ 7; Metromont Investigation Memo. at 2; NCOSHA Report at 3). Additionally, Mr. Southern was a diabetic and frequently concerned about his blood sugar level. (Guy Aff. ¶ 7). Emergency medical personnel who attended to Mr. Southern following the accident reported a glucometer measurement of twenty-eight, well below a normal range of between eighty and 120. (Metromont Investigation Memo. at 2; NCOSHA Report at 3). The administrator of the glucometer test also stated, however, that any time a glucometer reading is below 50, its accuracy should be questioned, and Mr. Southern was never re-tested. (Rhoades Statement attached as Suppl. Exh. F to Pl. Resp. Opp. Summ. J.; NCOSHA Report at 3). Ronnie Nesbitt, who was an employee of a company that serviced fire extinguishers and who was present at the time of the accident, stated that when he arrived at the plant and spoke to Mr. Southern, he noticed that Mr. Southern "had a somewhat glazed expression on his face, and was not as responsive as [Mr. Nesbitt] normally knew him to be." (Nesbitt Aff. ¶ 3). Mr. Nesbitt stated that after conducting his inspections, which took approximately twenty minutes, he again spoke to Mr. Southern to tell him he was leaving, and Mr. Southern did not respond to him at all, acting as though he was not aware of Mr. Nesbitt's presence. (*Id.* ¶¶ 4, 7). According to Mr. Nesbitt, this lack of response was unusual because Mr. Southern "was normally cordial and responsive." (*Id.*) Before Mr. Nesbitt reached his car, he heard a noise and turned to see Mr. Southern fall. (*Id.*) Mr. Nesbitt subsequently reported to Lieutenant Andre Massey of the Hendersonville Police Department that he felt that the forklift operator was traveling at a high rate of speed. (Massey Incident Report at 3).

According to Mr. Crosby, his review of the OSHA logs from the Hendersonville plant between 1995 and the date of the accident revealed no other reportable accidents during that time period. (Crosby Summ. J. Aff. at 2). Mr. Crosby also noted in his affidavit that in 1999, a safety inspector from Liberty Mutual Insurance Company, Metromont's general liability carrier, performed a safety inspection of the Hendersonville plant, which included the safety of the forklift operations. (Crosby Summ. J. Aff. at 7–8; *see also* Liberty Mutual Safety Inspection Report dated June 3, 1999 attached as Exh. C to Def. Notice of Compliance ("Liberty Mutual Inspection")). According to Mr. Crosby, the inspector noted that the traffic passageways were well maintained and of adequate clearance, that the forklifts were equipped with flashers and back-up alarms, and that the operators were wearing seatbelts as required. (Crosby Summ. J. Aff. at 8; *see also* Liberty Mutual Inspection). The only recommendation made by the safety inspector concerning forklift safety was the installation of a mirror on the corner of the building opening as provided on the front entrance doorway. (Liberty Mutual Inspection). An examination of the forklift following the accident showed that the forklift was operating correctly, and the back-up alarm and flashing yellow light on the forklift were working properly. (Crosby Summ. J. Aff. at 4).

With respect to Mr. Putnam, the forklift driver, Defendants' evidence shows that he was certified as a forklift operator on October 30, 1999, following training which included review of literature on safe forklift operations, a videotape on forklift training, a demonstration of a forklift operator's daily inspection, a skills test on the forklift, and a written test on the forklift. (Exh. 2 attached to Crosby Summ. J. Aff. ("Crosby Summ. J. Aff. Exh. 2"); Putnam Aff. ¶ 2). Mr. Crosby stated in his affidavit that Mr. Putnam had received training in numerous areas of plant safety over many years,

including other training on forklift operations, and that a portion of his training would have involved becoming familiar with the Metromont Safety and Health Manual. (Crosby Summ. J. Aff. Exh. 2). The Metromont Safety and Health Manual contains a section on Forklift Operator Responsibilities, which section includes directives for the forklift operator to "slow down, sound the horn and proceed with caution at cross aisles and other location [*sic*] where vision is obstructed." (Exh. 4 attached to Crosby Summ. J. Aff. at 12). This manual also directs forklift drivers to "look in the direction of, and keep a clear view of the path of travel." (*Id.*) Finally, the manual includes OSHA directives that the operator is to sound the horn or other warning device at all cross aisles, exits, elevators, sharp corners, ramps, blind corners, and when approaching pedestrians. (*Id.* at 32). Notwithstanding this training and the directives in the Metromont Safety and Health Manual, Mr. Putnam reported after the accident that he did not blow the horn on the forklift when entering the building and that he had never been instructed to do so. (NCOSHA Report at 3).

In its own conclusions about the accident, the North Carolina Department of Labor, OSHA Division ("NCDOL OSHA"), determined that the incident was neither willful nor a repeat of a prior accident. (NCOSHA Report). The NCDOL OSHA did, however, issue a citation for two serious violations pertaining to the lack of training of forklift operators to slow down and sound the horn on the forklift when driving in and out of the building. (Exh. A attached to Pl. Br. Opp. Summ. J. at 13). NCDOL OSHA then fined Metromont $1,750.00 for these violations, which fine was reduced to $875.00 pursuant to a settlement agreement with Metromont. (*Id.* at 13, 38). Lieutenant Andre Massey, who investigated the accident for the Hendersonville Police Department, like-wise concluded that there was no intentional misconduct by anyone and that the incident appeared, instead, "to be an unfortunate accident." (Massey Aff.).

In its response to Defendants' motion for summary judgment, Plaintiff filed the expert report of Richard Pearson, a forensic consultant and professor emeritus of industrial engineering at North Carolina State University. (Pearson Expert Report attached as Exh. I to Def. Mot. for Summ. J. ("Pearson Report")). Dr. Pearson opined, based on his forty years of experience in human factors engineering and based on his review of the Complaint, portions of the Metromont Safety Manual, the Hendersonville Police Department report on the accident, NCDOL OSHA's inspection record for Metromont, and reports of certain other incidents at Metromont plants, that the accident which killed Mr. Southern "must be attributed to the failure of Metromont [ ] to provide proper training to its forklift truck operators." (*Id.*) Dr. Pearson found further that Metromont knew of forklift hazards but nevertheless failed to address them. (*Id.*) Dr. Pearson opined that Metromont "failed to act as a reasonably prudent manufacturer" by failing to provide proper training to its forklift truck operators as required by OSHA regulations. (*Id.* at 3). Dr. Pearson stated that he had seen no evidence that Metromont provided forklift safety training to Mr. Putnam and that the pedestrian path taken by Mr. Southern should have been marked. (*Id.* at 4). Dr. Pearson noted that Mr. Putnam stated that he had not been trained to sound his horn upon entering the building, that one witness stated that the forklift was traveling at a high rate of speed, and that another witness stated that Mr. Putnam was looking away at the time of the collision. (*Id.* at 3). Dr. Pearson opined that Mr. Southern's failure to wear his glasses and visual impairment were irrelevant in light of Mr. Putnam's

failure to sound his horn, lack of attention to the path of the forklift, and operation of the forklift at a high rate of speed. (*Id.* at 5).

Plaintiff also submitted investigation reports from an accident that occurred at a Metromont Plant in Charlotte, North Carolina on September 2, 1999. (Exh. B attached to Pl. Resp. Opp. Summ. J.). According to the investigation reports, a Metromont employee ran over a co-worker with a cement mixer truck while backing up, killing him. (*Id.* at 3, 11). Interviews and investigations revealed that the back-up alarm on the mixer truck had been intentionally disconnected at a customer's request in order to comply with a City of Charlotte noise ordinance and not subsequently re-connected. (*Id.* at 23). Noting that Metromont had earlier been issued a citation in South Carolina for not having back-up alarms on an industrial truck/forklift that was involved in a fatal accident, NCDOL OSHA concluded that Metromont committed a serious and willful violation of safety regulations "with plain indifference to the law" and fined Metromont a total of $69,300, of which Metromont ultimately paid $41,580.00. (*Id.* at 27, 28, 48–50, 65–68).

Finally, following the entry of this Court's order compelling the production of all reports concerning personal injuries and fatalities occurring at Defendants' plants as a result of PITs, Defendants submitted the investigation documents and reports concerning a fatal forklift accident that occurred on November 16, 1998 at a Metromont plant in South Carolina. (Exh. 1 attached to Def. Suppl. Response to Discovery Pursuant to Court Order of 12/8/03 ("S.C. Accident Report")). According to these reports, this accident occurred outside while it was dark and when the employee walked behind the forklift in an area that was not well lit. (*Id.*) The employee apparently walked past the forklift and then suddenly doubled back. (*Id.*) The employee was walking in an area that he should not have been in, and following the accident, the employee stated that it was not the forklift operator's fault. (*Id.*) The forklift operator reported that his back-up alarms were on and that he looked back but did not see his co-worker. (*Id.*) Mr. Crosby stated in his affidavit that as a result of this accident, Metromont installed improved lighting in the area, which had been ordered before the accident but not yet received. (Crosby Aff. at 4).

## DISCUSSION

### I. Motion for Summary Judgment

#### A. Summary Judgment Standard

The standard for summary judgment is familiar. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In evaluating a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party. *See id.*, 477 U.S. at 255, 106 S.Ct. at 2514. However, once the movant has shown an absence of any genuine issue of material fact, the nonmoving party must produce evidence demonstrating that a triable issue of fact exists. *See id.*, 477 U.S. at 248, 106 S.Ct. at 2510; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

**B. Discussion**

■ Defendants move for summary judgment on the basis that Plaintiff's wrongful death action against them is precluded by the exclusivity provisions of North Carolina's Workers' Compensation Act ("the Act"), N.C. Gen.Stat. § 97–1, *et seq.* These exclusivity provisions are set forth in two sections of the Act. Specifically, Section 97–9 of the Act requires every employer subject to the Act to secure workers' compensation benefits for its employees and provides that as long as the employer secures workers' compensation benefits for its employees, the employer "shall only be liable to any employee for personal injury or death by accident to the extent and manner" specified in the Act. N.C. Gen.Stat. § 97–9. Section 97–10.1 provides further that if a particular employer and employee have complied with the Act's requirements, "then the rights and remedies ... granted [under the Act] to the employee, his dependents, next of kin, or personal representative shall exclude all other rights and remedies ... as against the employer at common law or otherwise" as a result of the employee's injury or death. *Id.* § 97–10.1. These two provisions function to limit the amount of recovery available for work-related injury or death and to preclude an employee from seeking potentially larger damages awards in civil actions. *See Woodson v. Rowland,* 329 N.C. 330, 338, 407 S.E.2d 222, 227 (1991). This exclusion of alternative remedies is balanced in the Act by other provisions which provide "for an injured employee's certain and sure recovery without having to prove employer negligence or face affirmative defenses." *Id.* Thus, "[t]he Act seeks to balance competing interests and implement tradeoffs between the rights of employees and their employers." *Id.*

■ Although the Act generally provides the exclusive remedy for employees injured or killed in a workplace accident, in the *Woodson* case, the North Carolina Supreme Court held that "when an employer intentionally engages in misconduct knowing it is substantially certain to cause serious injury or death to employees and an employee is injured or killed by that misconduct," the employee or personal representative may pursue a civil action against the employer. *Woodson,* 329 N.C. at 340–41, 407 S.E.2d at 228. This exception applies when the employer's misconduct is "tantamount to an intentional tort," in which case the exclusivity provisions of the Act do not bar an employee's action in tort against the employer. *Pendergrass v. Card Care, Inc.,* 333 N.C. 233, 239, 424 S.E.2d 391, 395 (1993); *Woodson,* 329 N.C. at 341, 407 S.E.2d at 228. The North Carolina Supreme Court has emphasized, however, that this exception is narrow and "applies only in the most egregious cases of employer misconduct." *Whitaker v. Town of Scotland Neck,* 357 N.C. 552, 557–58, 597 S.E.2d 665, 668 (2003). As explained by the North Carolina Supreme Court, "[s]uch circumstances exist where there is uncontroverted evidence of the employer's intentional misconduct and where such misconduct is substantially certain to lead to the employee's serious injury or death." *Id.*

■ In applying the *Woodson* exception to the Workers' Compensation exclusivity provisions, North Carolina courts have held that even where an employer is in violation of OSHA safety regulations, a *Woodson* claim will not lie unless there is evidence from which a reasonable jury could conclude that the employer knew that its misconduct was substantially certain to result in serious injury or death. *See, e.g., Whitaker,* 357 N.C. 552, 554, 557–58, 597 S.E.2d 665, 666, 668 (affirming summary judgment and reversing Court of Appeals where defective equipment caused

employee's death and NCDOL OSHA investigator identified five "serious" violations of state labor laws resulting in penalties of $10,500 but where there was no evidence of history of multiple, significant violations of safety regulations and no evidence that employer was substantially certain that equipment would fail or that serious injury or death would be substantially certain to follow); *Regan v. Amerimark Bldg. Prods., Inc.*, 127 N.C.App. 225, 228–29, 489 S.E.2d 421, 424 (1997) (affirming summary judgment in favor of employer where employer knew operation of machine without safety mechanism was in violation of OSHA regulations and had been cited for such violation but where employer was working to remedy violation and employee had operated machine in same manner without injury ten to twenty times per shift), *aff'd*, 347 N.C. 665, 496 S.E.2d 378 (1998). As emphasized by the *Whitaker* Court, "simply having knowledge of some possibility, or even probability, of injury or death is not the same as knowledge of a substantial certainty of injury or death." *Whitaker*, 357 N.C. 552, 557–58, 597 S.E.2d 665, 668. Where the facts support only the conclusion that an accident occurred, rather than intentional misconduct, summary judgment in favor of the employer is appropriate. *See id.* at 558, 597 S.E.2d 665, 669.

▮ In this case, there is no evidence that any of the Defendants or their representatives was aware that the failure of the forklift driver to honk his horn upon entering or exiting the Metromont plant building was substantially certain to cause serious injury or death. The undisputed evidence establishes that a forklift traveled through the building more than 100 times per day, traveling the same path at approximately the same rate of speed. With only five employees at the plant, each would have been aware of the frequency and path of the forklift, perhaps none more so than the decedent himself who

was plant manager. While Plaintiff cites a lack of training of Mr. Putnam, the undisputed evidence is that Mr. Putnam did receive training in the safe operation of the forklift, and even if Mr. Putnam was not trained specifically to sound the horn upon entering the building, there is no evidence whatsoever that injury or death was substantially certain to occur, as the forklift had been operated in the same manner every working day for years and there is no evidence of any prior injuries or deaths attributable to a human collision with a forklift. There is also no evidence that Defendants had previously been cited for its forklift drivers' failure to sound the horn upon entering its buildings, nor are any of the prior accidents cited by Plaintiff at all similar to the accident that caused the decedent's death. While both of the prior accidents involved a human collision with a vehicle, both vehicles were backing up, in one case without a back-up alarm and in the second case, it was dark outside and the employee was not walking in an area approved for pedestrian traffic. The Court notes further that even if Mr. Putnam was not trained as he should have been, Mr. Southern was the individual at the plant responsible for ensuring that plant employees were properly trained and that all equipment at the plant was operated in a safe manner.

With respect to the cause of the accident, the Court notes that the evidence strongly suggests that Mr. Southern may have been impaired, either because of his vision impairment or because of low blood sugar, though the evidence also suggests that neither Mr. Putnam nor Mr. Southern was looking at the path of the forklift when the accident occurred. NCDOL OSHA representatives investigating the accident concluded that this accident was neither willful nor a repeat incident; even Plaintiff's expert stated only that Metromont "failed to act as a reasonably prudent

manufacturer" by failing to provide proper forklift safety training as required by OSHA regulations. (Pearson Report at 3). The failure to act as a reasonably prudent manufacturer suggests that Defendants were, at most, negligent, and *Woodson* and its progeny make abundantly clear that the *Woodson* exception applies only to conduct that is "tantamount to an intentional tort." *See Pendergrass,* 333 N.C. at 239, 424 S.E.2d at 395; *Woodson,* 329 N.C. at 341, 407 S.E.2d at 228. Here, there is no evidence whatsoever that Defendants engaged in any intentional misconduct or that they were substantially certain that the alleged misconduct would result in serious injury or death. Rather, "[t]he facts of this case involve ... human error that amount[s] to an accident." *Whitaker,* 357 N.C. 552, 558–59, 597 S.E.2d 665, 669. The accident was tragic, but an accident nonetheless. Without evidence of intentional misconduct that was substantially certain to result in serious injury or death, the *Woodson* exception to the Act's exclusive remedy provisions does not apply in this case, and Defendants are entitled to summary judgment as to Plaintiff's wrongful death action.[2]

## II. Motion to Compel and Motions for Sanctions

 In addition to Defendants' motion for summary judgment, the Court also has pending before it Plaintiff's second motion to compel discovery and motions to impose sanctions for discovery violations. In particular, Plaintiff asserts that it is entitled to further discovery concerning any OSHA reports relating to injuries or deaths at Defendants' places of business caused by PITs. Defendants have certified, however, that they have sought all such records from any accident that occurred in the United States and that they have turned over to Plaintiff all records from any such accidents. Defendants have provided specific information as to how they searched for those records and have certified that no other records exist. Accordingly, Plaintiff's second motion to compel is due to be denied. Additionally, as there is absolutely no evidence that Defendants violated Rule 11 in any of their pleadings or responses to discovery requests, the Court likewise will deny Plaintiff's motions for sanctions.

## CONCLUSION

Because Plaintiff has failed to produce any evidence that Defendants engaged in intentional misconduct substantially certain to lead to serious injury or death, much less sufficient evidence to create a genuine issue of material fact, Defendants' motion for summary judgment is due to be granted and Plaintiff's motion to refuse summary judgment is due to be denied. Having found that Defendants have complied with this Court's order on discovery and have engaged in no misconduct such that Rule 11 sanctions would be warranted, the Court will deny Plaintiff's motion to compel and motions for sanctions. Judgment will be entered contemporaneously herewith.

---

2. As Defendants' motion for summary judgment is due to be granted, Plaintiff's motion to refuse summary judgment is likewise due to be denied.